**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kimberly Colin La Salle,<br><br>Petitioner,<br><br>v.<br><br>Dominick Johnathan Adams,<br><br>Respondent. | No. CV-19-04976-PHX-DWL<br><br>**ORDER** |

**INTRODUCTION**

Kimberly Colin La Salle ("Mother") and Dominick Johnathan Adams ("Father") are the parents of two minor children, E.N.A. and M.E.Y.A. (together, "the Children"). On August 19, 2019, Mother filed an amended verified petition under the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq.*, which implements the provisions of the Hague Convention on the Civil Aspects of International Child Abduction. (Doc. 6.) In a nutshell, the petition alleges that the Children were born and raised in Canada, that Mother and Father shared joint custody of the Children pursuant to a divorce decree that was issued by a Canadian court in October 2018, and that Father violated the divorce decree (and the ICARA) by moving to Arizona in February 2019 and taking the Children with him. (*Id.* ¶¶ 9-15.) The petition requests, among other things, an order "establishing that the Children shall be returned to Alberta, Canada where an appropriate custody determination can be made by a Canadian court under Canadian law." (*Id.* at 9.)

On November 12, 2019, the Court held an evidentiary hearing. As explained below,

although the evidence introduced during the hearing shows that Father is a loving parent whose decision to leave Canada was, in some ways, understandable, the evidence easily establishes that Father violated the ICARA. Accordingly, Mother's petition will be granted and Father will be required to return the Children to Canada.

**FINDINGS OF FACT**

During the evidentiary hearing, Mother (who is represented by counsel) called three witnesses: (1) Mother, (2) Giselle Kutrowski, and (3) Michelle Hansen. (Doc. 27.) Additionally, Father (who is proceeding pro se) called three witnesses: (1) Laurel Berg (Mother's mother), (2) Donna Adams (Father's mother), and (3) Father. (*Id.*) The findings of fact set forth below are based on those witnesses' testimony and the exhibits that were admitted during the hearing:

I. <u>Background Concerning Mother, Father, And The Children</u>

In April 2011, Mother and Father were married in Alberta, Canada. (Exhibit 2.) Although Mother is a citizen of Canada, Father is not—he is a citizen of the United States who had status to live and work in Canada because Mother sponsored his application for a visa. (Doc. 6 ¶¶ 12-13; Doc. 21 ¶¶ 3, 12-13, 15.)

In August 2012, the couple's first child, a boy named E.N.A., was born in Canada. (Exhibit 1.) In January 2014, the couple's second child, a girl named M.E.Y.A., was born in Canada. (*Id.*) Both Children are dual citizens of Canada and the United States.

Mother, Father, and the Children lived together in Canada until around March 2017, when Mother and Father's marriage began to deteriorate. (Doc. 21 ¶ 20.) The deterioration was caused by several factors, including Father's failure to provide consistent financial support and Mother's romantic relationship with another man, Howard LaSalle ("LaSalle"), whom she eventually married.

II. <u>Father's Loss Of Immigration Status In Canada</u>

In early 2017, as the marriage was falling apart, Mother withdrew her sponsorship for Father's visa. (Exhibit T.) Mother credibly testified during the evidentiary hearing that she did so out of necessity—Canadian law requires the sponsor to be the spouse or

significant other of the visa applicant (and the relationship was heading toward a divorce) and Canadian law also obligates the sponsor to provide financial support to the visa applicant (which Mother could not afford to do). As a result, in July 2017, Father received formal notification from the Canadian government that he would be losing his immigration status in Canada. (*Id.*)

Father testified during the evidentiary hearing that he made various unsuccessful efforts, after receiving this July 2017 notification, to obtain immigration status in Canada by means other than sponsorship by Mother. However, Father did not introduce any documentary evidence concerning these efforts[1] and it is unclear to the Court how extensive or sincere those efforts were.

III. Mother's Temporary Residence In A Maternity Home

As noted, the marriage between Mother and Father deteriorated in part due to Mother's relationship with another man, LaSalle. In 2017, Mother and LaSalle had a child together (who will be referred to by his first initial, "X").

Around the time of X's birth, officials with the Central Alberta Child and Family Services Authority ("CFSA") received anonymous reports that LaSalle was engaging in verbal abuse toward Mother,[2] that drug use had occurred or was occurring in the home,[3] and that children were being locked in bedrooms.[4] As a result, CFSA officials recommended, but did not require, that Mother temporarily move into a maternity home. Mother agreed to follow this recommendation and moved into a nearby facility (the Central Alberta Pregnancy Care Network) in May 2018.

---

[1] However, Father did include, as an attachment to his answer, a letter purporting to show that, in July 2018, he submitted an application for permanent residence in Canada "under humanitarian and compassionate considerations." (Doc. 21 at 20.)

[2] The uncontradicted evidence presented during the evidentiary hearing is that LaSalle has never engaged in, or been accused of engaging in, any physical violence toward others—the only alleged abuse was of a verbal nature.

[3] The only evidence related to drug use presented during the evidentiary hearing was that LaSalle previously used marijuana (which, under Canadian law, is lawful for recreational use). Mother testified that she has never used drugs and Ms. Kutrowski verified that Mother's initial drug test when entering the maternity home was negative.

[4] Mother testified, without contradiction, that the allegation concerning locking children in bedrooms was false.

During her stay in the maternity home, Mother successfully participated in and completed various courses on parenting skills. (Exhibits 10, 11.) Separately, LaSalle successfully participated in and completed a course on anger management. (Exhibit 12.) And Mother and LaSalle jointly worked together with a counselor to develop a "safety plan" intended to create strategies for LaSalle to control his temper. (Exhibit 9.) The author of the safety plan concluded that "[e]ngagement and insight provided by [LaSalle and Mother] was beyond my expectations. It is my opinion that they both contributed and were actively involved in process." (*Id.*)

During the initial part of her stay in the maternity home, Mother was not allowed to keep the Children for overnight visits. As a result, she only saw the Children periodically. However, after displaying improvement to the satisfaction of Ms. Kutrowski, the maternity home's director, Mother was allowed to resume overnight custodial visits with the Children.

Ms. Kutrowski credibly testified that she has observed Mother and LaSalle interact with X on multiple occasions and that their parenting skills and behavior were always appropriate. Ms. Kutrowski also credibly testified that LaSalle displayed "significant improvement" in his anger management skills during the course of Mother's stay in the maternity home.

In February 2019, Mother began meeting with Ms. Hansen of Turning Point, a support group for women. Ms. Hansen, like Ms. Kutrowski, credibly testified that she has seen Mother and LaSalle interact with X on multiple occasions and has no concerns about their parenting skills.

In July 2019, Mother moved out of the maternity home. She currently resides in a three-bedroom home in Canada with LaSalle, X, and LaSalle's child from a previous relationship.

IV. <u>The Divorce Decree</u>

Although Mother and Father stopped living together in 2017, they did not finalize their divorce until October 2018. The divorce decree, which was issued by a Canadian

court on October 2, 2018, specifically provides that Mother and Father "have joint custody of the children of the marriage." (Exhibit 2 at 2. *See also* Doc. 21 ¶ 21 [Father's answer, not disputing the contention in the amended petition that the divorce decree awarded "joint custody"].)

The divorce decree provides that Father is responsible for providing the Children's "primary residence" and "day to day care and control" but clarifies that Mother is entitled to "access with the children every other weekend commencing September 1, 2017 and continuing thereafter until further Order of the Court," with Mother "responsible for picking the children up at the commencement of her access and dropping the children off at the end of her access at [Father's] residence." (Exhibit 2 at 2.) Additionally, the divorce decree provides that Mother and Father must "equally share all school vacations and holidays" and that each parent must "have direct or indirect access to education, counselling, therapy, daycare services, and any other information regarding the welfare of the children." (*Id.* at 3.) Finally, the divorce decree provides that each parent may "travel with the children within Canada and outside of Canada without the written consent of the other party provided the person travelling with the children provides the non-travelling party with a travel itinerary and contact information." (*Id.*)

V. The Incidents Offered To Illustrate "Grave Risk"

During the evidentiary hearing, Father elicited testimony concerning an array of incidents that were apparently offered to show that returning the Children to the care of Mother and LaSalle in Canada would expose them to a "grave risk" of harm. The legal significance of these incidents is addressed in the Conclusions of Law section of this order, *infra*. Here, the Court simply provides its factual findings concerning the incidents.

On one occasion in 2017, Mother went to the residence she had previously shared with Father to see the Children. Father was not present at the residence but his mother (the Children's grandmother), Donna Adams, was there. When Mother arrived, the door was locked. Mother tried to force her way into the residence, became angry when she couldn't enter, and eventually retrieved a baseball bat from her car and began banging on the door.

The Children became anxious and frightened during this episode and Ms. Adams eventually called Mother's mother, Laurel Berg, to come to the residence and help settle things down.

In or around July 2018, E.N.A. broke his arm while in Mother's custody. (Exhibit 20.) The injury was accidental and likely occurred when E.N.A. slipped while getting off a bus.[5]

At some point in 2017 or 2018, after Mother had separated from Father and started living with LaSalle, Father passed by LaSalle's home. When LaSalle saw Father, LaSalle became angry and had to be held back by Mother. (Exhibit R.)

Mother did not have consistent access to a car after separating from Father. As a result, she was sometimes required to transport the Children via public transportation—specifically, the bus. This sometimes caused the Children to have to wait, outside, at the bus stop during very cold Canadian winters. The Children were not always properly clothed to protect themselves from the cold.

Sometimes, after the Children were returned to Father's care after spending time with Mother, they reported they were hungry.

Following the separation of Mother and Father, the Children were often sad about Mother's absence and became more emotionally attached to Father.

VI. <u>Father's Move To Arizona</u>

In late February 2019, Father moved to Arizona and took the Children with him. At the time of the move, the Children were enrolled in school in Canada. After arriving in Arizona, Father and the Children began living with Father's parents (the Children's grandparents).

Father initially lied to Mother about the nature of the trip to Arizona, falsely characterizing it as a "vacation." For example, on March 1, 2019, Father sent an email to

---

[5] Mother testified that the injury occurred while E.N.A. was skipping and playing with his sister. It is irrelevant, from the Court's perspective, whether the injury arose from a fall from a bus or from skipping—the bottom line is that it was an accidental injury sustained by a young child.

Mother that stated: "Per our conversation a few months ago about taking a vacation in February we've left and I will email when we are there . . . . [W]e will just be at my parents and there's a wedding that we're going to." (Exhibit 3.) Five days later, on March 6, 2019, Father sent another misleading email to Mother, entitled "Itinerary update," that provided: "I don't have a return date set I'm waiting to see how I can work out going and visiting my cousin . . . ." (Exhibit 4.)

On March 10, 2019, Mother emailed Father to complain that he'd violated the terms of the divorce decree by failing to identify where the Children were located. (Exhibit 5 at 2.) In this email, Mother also threatened to call law enforcement officials in Canada if Father didn't immediately provide this information. (*Id.*) The next day, Father responded by providing an address in Sun City, Arizona. (*Id.* at 1.)

Around this time, Mother visited the home where Father had been living in Canada. Upon arrival, Mother realized Father hadn't simply taken the Children on a temporary vacation—the house was empty, the refrigerator was cleaned out, and it was clear "[t]he kids have obviously been moved." (*Id.*)

In early April 2019, Mother contacted law enforcement officials in Arizona for assistance. (Exhibit 6. *See also* Doc. 21 ¶ 41 [Father's answer, acknowledging visit by Arizona law enforcement officials on April 1, 2019].) Around this time, Mother also sent another email to Father asking him to immediately "provide . . . a return date of when the children will be brought back [to Canada]." (Exhibit 6.) In response, Father vaguely stated that he would be "heading back" at some point after his father's surgery in June 2019. (*Id.*)

This, too, was a false statement. Father never returned to Canada, prompting Mother to initiate this proceeding in August 2019.

In the nine months they have lived in Arizona (February-November 2019), the Children have not regularly attended school. Although Father enrolled them in an online program, it has yet to produce consistent instruction.

…

…

**CONCLUSIONS OF LAW**

"A court that receives a petition under the Hague Convention may not resolve the questions of who, as between the parents, is best suited to have custody of the child." *Cuellar v. Joyce*, 596 F.3d 505, 508 (9th Cir. 2010). Instead, the court must begin its analysis by determining whether "the child has been wrongfully removed or retained within the meaning of the Convention." 22 U.S.C. § 9003(e)(1)(A). The petitioner—here, Mother—bears the burden of proof on this issue and must prove it by a preponderance of the evidence. *Id.*

To determine whether the removal or retention was "wrongful," a district court must answer a series of four questions:

> (1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence? (4) Was the petitioner exercising those rights at the time of the removal or retention?

*Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001).

If the Court answers these questions in the petitioner's favor, the burden shifts to the party opposing the return of the child—here, Father—to prove "by clear and convincing evidence that one of the exceptions set forth in article 13b or 20 of the Convention applies." *Id.* § 9003(e)(2)(A).

I. Date Of Removal Or Retention

The first question to be addressed in an ICARA proceeding is "[w]hen did the removal or retention at issue take place?" *Mozes,* 239 F.3d at 1070.

The evidence introduced during the evidentiary hearing establishes, and it appears undisputed, that the challenged removal occurred in late February 2019, when Father took the Children to Arizona. Moreover, to the extent the initial removal wasn't wrongful (because Father was allowed, under the divorce decree, to take the Children on short international vacations without Mother's permission), his retention of the Children in Arizona because wrongful in March 2019, once Mother began missing the every-other-weekend visits to which she was entitled under the divorce decree.

II.     Habitual Residence

The second question to be addressed in an ICARA proceeding is "[i]mmediately prior to the removal or retention, in which state was the child habitually resident?" *Mozes*, 239 F.3d at 1070.

Here, it is unclear whether Father disputes Mother's contention that Canada was the Children's country of habitual residence in February/March 2019. In the amended petition, Mother alleged that "[t]he Children, [Father], and [Mother] were all habitual residents of Alberta, Canada at the time that [Father] wrongfully removed the Children to the United States, in or around February of 2019." (Doc. 6 ¶ 15.) In his answer, although Father stated "deny" in response to this paragraph of the petition, Father proceeded to explain that he was only denying the contention that his decision to remove the Children from Canada was "wrongful." (Doc. 21 ¶ 15.) This suggests, at least implicitly, that Father wasn't denying the allegation that Canada was the Children's country of habitual residence. Moreover, during closing argument, Father didn't address the concept of habitual residence at all, prompting the Court to ask whether he was conceding the issue. In response, Father merely stated that "I would dispute that they've acclimated to life here" and pointed out that the Children have dual Canadian/American citizenship.

Nevertheless, assuming the issue remains disputed, the Court easily concludes that Canada was the Children's country of habitual residence in February/March 2019. The Children were born in Canada, lived their entire lives in Canada, attended school in Canada, have a Canadian mother, and have Canadian citizenship. Their only slight connection to the United States is that one of their parents, Father, is a United States citizen (and his citizenship rendered them dual Canadian/American citizens).

It should be noted that the facts of this case are different from the facts usually present in ICARA cases. The typical ICARA scenario is that a child is born in the United States, the child and the child's parents then relocate to a foreign country, the parents' relationship deteriorates while abroad, one parent returns to the United States with the child, and the other parent then brings an ICARA action to compel the return of the child

to the foreign country. In that scenario, the key question is whether the child's country of habitual residence shifted from the United States to the foreign country during the period of foreign residence. *See generally Holder v. Holder*, 392 F.3d 1009, 1017-18 (9th Cir. 2004). And under Ninth Circuit law, courts must assess "the subjective intent of the parents, not the children," to determine whether the parents intended to abandon the United States as the country of habitual residence. *Id.* at 1016.

Here, in contrast, there was no relocation before February/March 2019 that might raise doubts about whether the Children's country of habitual residence ever shifted from Canada—the evidence presented during the evidentiary hearing suggests the Children spent every moment of their lives in Canada until they were taken to Arizona. This should end the inquiry. *In re A.L.C.*, 607 Fed. App'x 658, 662 (9th Cir. 2015) ("The district court clearly erred in finding E.R.S.C. could be a habitual resident of a nation in which she never resided. . . . [W]e recognize the obvious truth that 'habitual residence cannot be acquired without physical presence.'").

Finally, even under the two-step test for assessing habitual residence that is applied in ICARA cases (unlike this case) involving children who lived in both the United States and a foreign country before the date of the challenged removal,[6] Canada remains the Children's country of habitual residence. First, although neither parent specifically addressed the concept of residential intent when testifying during the evidentiary hearing, there is strong circumstantial evidence that Mother and Father had a shared, settled intent to reside permanently in Canada. *Holder*, 392 F.3d at 1017 (parental intent may be expressed not only through "the representations of the parties" but also through "all available evidence"). Indeed, Mother is a Canadian citizen who appears to have lived in Canada for all of her adult life and Father lived in Canada from at least 2011 through February 2019, leaving only after he lost his immigration status and was unable to identify

---

[6] *Murphy v. Sloan*, 764 F.3d 1144, 1150 (9th Cir. 2014) ("[T]he proper standard for habitual residence . . . [1] takes into account the shared, settled intent of the parents and [2] then asks whether there has been sufficient acclimatization of the child to trump this intent.").

- 10 -

an alternative means to secure legal status.

Second, to the extent the concept of acclimatization is even applicable here,[7] it does not change the analysis. *See generally Murphy*, 764 F.3d at 1152-53 (noting that "courts should be slow to infer [acclimatization], both because the inquiry is fraught with difficulty, and because readily inferring abandonment would circumvent the purposes of the Convention") (citation and internal quotation marks omitted). During their brief time in Arizona, the Children have barely even attended school and they retain deep familial ties to Canada.

III. <u>Rights Of Custody</u>

The third question to be addressed in an ICARA proceeding is "[d]id the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence?" *Mozes*, 239 F.3d at 1070.

Here, the answer is yes. First, Mother possessed rights of custody to the Children under the law of Canada. Indeed, the divorce decree expressly states that Mother and Father share "joint custody of the children of the marriage." (Exhibit 2 at 2. *See also* Doc. 21 ¶ 21 [Father's answer, not disputing the contention in the amended petition that the divorce decree awarded "joint custody"].)

Second, Father breached Mother's custodial rights when he relocated the Children to Arizona in February 2019. Among other things, the divorce decree granted Mother the right to "have access with the children every other weekend." (Exhibit 2 at 2.) Thus, even though it may have been permissible under the divorce decree for Father to take the Children to Arizona for a short vacation without Mother's permission—indeed, Father

---

[7] Usually, acclimatization is invoked by the petitioner in an ICARA case to show that a child should be considered a habitual resident of a foreign country even though the child's parents didn't have a shared, settled intent to live there. *Mozes*, 239 F.3d at 1078 (the concept of acclimatization reflects the principle that, "given enough time and positive experience, a child's life may become so firmly embedded in the new country as to make it habitually resident even though there [may] be lingering parental intentions to the contrary"). Moreover, the acclimatization must have occurred before the date on which the child was wrongfully relocated to the United States. Here, in contrast, Father's theory appears to be that the Children became acclimatized to life in the United States after the February 2019 move.

- 11 -

initially lied to Mother about the nature of the trip in an effort to make it look like a vacation—the trip became wrongful once two weeks passed and Mother began being deprived of her every-other-weekend time with the Children.

In his answer, and to some extent during the evidentiary hearing, Father argued that his decision to take the Children to Arizona wasn't wrongful because Mother caused him to lose his immigration status in Canada (by withdrawing her support for his visa application) and thus left him with no choice but to take the Children. (*See, e.g.,* Doc. 21 ¶ 15.) This argument, which appears to be a variant of an "unclean hands" defense, lacks merit for three reasons.

First, Father has not cited any authority suggesting that "unclean hands" is available in an ICARA proceeding and some courts have concluded it is categorically unavailable. *Karpenko v. Leendertz*, 619 F.3d 259, 265-66 (3d Cir. 2010) ("[W]e are not aware of any authority that would support dismissal of a Hague Convention petition on grounds of unclean hands. . . . [A]pplication of the unclean hands doctrine would undermine the Hague Convention's goal of protecting the well-being of the child, of restoring the status quo before the child's abduction, and of ensuring 'that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.'") (citation omitted).

Second, as a factual matter, Mother didn't engage in wrongful conduct by withdrawing her support for Father's visa application. Mother persuasively testified during the evidentiary hearing that she couldn't have continued supporting the application after she and Father split up—they were no longer in a relationship and she lacked the financial wherewithal to support him.

Third, and most important, this argument overlooks that Father became aware by no later than July 2017 that he was in danger of losing his immigration status in Canada, yet he still agreed to enter into a divorce decree in October 2018 that awarded joint custody to Mother. Father, in other words, was fully aware at the time he executed the divorce decree that he might have to leave Canada in the future. Mother can hardly be blamed for his

subsequent choice to unilaterally violate the agreement by relocating the Children to a different country. To the extent Father wished to modify the agreement in light of his immigration status, he should have petitioned the Canadian courts for relief, not taken matters into his own hands.

IV. <u>Exercise Of Rights</u>

The fourth question to be addressed in an ICARA proceeding is "[w]as the petitioner exercising those rights [of custody] at the time of the removal or retention?" *Mozes*, 239 F.3d at 1070.

Here, the answer is yes. The evidence introduced during the evidentiary hearing shows that Mother was regularly exercising her custodial rights around the time of the removal in February 2019. Although Father asserted in his answer that Mother may have missed some visitations and phone calls (*see, e.g.,* Doc. 21 ¶ 23), and although Mother wasn't allowed to keep the Children for overnight visits during some of her time in the maternity home, much more is required before a parent can be said to have failed to exercise custodial rights for ICARA purposes. *See, e.g., Asvesta v. Petroutsas*, 580 F.3d 1000, 1018 (9th Cir. 2009) (emphasizing that an ICARA petitioner has only a "minimal" burden when it comes to establishing the exercise of custodial rights, that such exercise may be established through proof of "regular contact" with family members, and that "requiring a petitioning party to meet a high bar in demonstrating the actual exercise of custody rights [would] contradict[] the Convention's objective to reserve custody determinations for the country of habitual residence") (citations omitted); *Walker v. Walker*, 701 F.3d 1110, 1121 (7th Cir. 2012) ("The standard for finding that a parent was exercising his custody rights is a liberal one, and courts will generally find exercise whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child. Indeed, a person cannot fail to exercise his custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child.") (citations and internal quotation marks omitted).

…

V.     <u>Grave Risk</u>

Because Mother has met her burden of establishing, by a preponderance of the evidence, all of the elements of her ICARA claim, she is entitled to an order compelling the return of the Children to Canada unless Father can establish, by clear and convincing evidence, that an exception applies. Here, Father relies on Article 13(b) of the Convention, which provides that a court "is not bound to order the return of the child if [the respondent] establishes that . . . there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."

A.     **Preliminary Matters**

Before turning to the merits of Father's grave-risk claim, it is necessary to address some preliminary matters. Father attempted to invoke Article 13(b) as an affirmative defense in a portion of his answer entitled "Request for Dismissal and Counterclaim." (Doc. 21 at 14.) Specifically, Father requested "[d]ismissal of the case to protect the children from psychological and emotional [d]amage that will be incurred if sent back to [Mother]" and proceeded to identify four reasons why the Children would be exposed to a risk of future harm if returned to Canada: (1) verbal abuse by LaSalle; (2) the prior incident where E.N.A. broke his arm, (3) "she [Mother] chooses to do drugs and to be in environments that put the children in danger"; and (4) "[t]he kids have an extraordinary emotional dependence on me." (*Id.*) Father also enclosed, as an attachment to his answer, a letter from his mother, Donna Adams, which contains additional criticisms concerning Mother. (Doc. 21 at 17-18.)

A few days before the evidentiary hearing, Mother filed a pair of motions concerning these portions of Father's answer. First, Mother filed a motion to dismiss the counterclaim, arguing that "[a]lthough [Father] has included this allegation [of future harm] under the heading 'Counterclaim,' it would be properly characterized as an affirmative defense under the ICARA." (Doc. 22 at 3.) This observation is true, but the Court disagrees with Mother that the remedy under the circumstances is to "dismiss" the counterclaim. Instead, the Court will simply construe this portion of Father's pro se answer

as raising an affirmative defense. The motion to dismiss will therefore be denied as moot.[8]

Second, Mother also filed a motion to strike portions of the answer and the letter that was attached to the answer, arguing that they contain "hearsay knowledge of demonstrably untrue impertinent and scandalous matters meant to embarrass and punish [Mother] for bringing this action." (Doc. 23 at 1.) This motion will be denied. Although the motion accuses Father of falsely claiming that he received phone calls alleging that drug abuse was occurring in Mother's home (*id.* at 2), Mother conceded during the evidentiary hearing that LaSalle has, in fact, used marijuana in the past. It is difficult to understand why factually accurate statements should be stricken from the answer, particularly when they are related to (and offered in support of) Father's grave-risk defense. Moreover, to the extent Father ultimately failed to prove, during the evidentiary hearing, some of the allegations contained in his answer and enclosed letter, this does not mean those allegations must be stricken.

B. **Merits**

The Ninth Circuit has emphasized that the grave-risk exception must be "drawn very narrowly" and "is not license for a court in the abducted-to country to speculate on where the child would be happiest." *Gaudin v. Remis*, 415 F.3d 1028, 1035-36 (9th Cir. 2005) (citations and internal quotation marks omitted). "Rather, the question is whether the child would suffer 'serious abuse' that is 'a great deal more than minimal." *Id.* at 1035 (citations omitted). Additionally, "because the Hague Convention provides only a provisional, short-term remedy in order to permit long-term custody proceedings to take place in the home jurisdiction, the grave-risk inquiry should be concerned only with the degree of harm that could occur in the immediate future." *Id.* at 1037. Thus, "even a living situation capable of causing grave psychological harm over the full course of a child's development is not

---

[8] Mother's motion also seeks the dismissal of Father's "counterclaim" opposing Mother's request for an award of fees. (Doc. 22 at 3-4.) Because this appears to be another instance where Father mischaracterized a denial as a counterclaim, the Court will not dismiss the challenged statement but simply construe it as a denial.

- 15 -

necessarily likely to do so in the period necessary to obtain a custody determination." *Id.*

Father has not come close to establishing the Children would be exposed to a grave risk of physical or psychological harm if returned to Canada. For example, although Mother's new husband, LaSalle, has experienced anger-management issues in the past, the evidence presented during the hearing demonstrates LaSalle has taken steps to address the problem. Indeed, Ms. Kutrowski and Ms. Hansen credibly testified that they have observed LaSalle with X and have no qualms about his suitability as a parent. Moreover, there is no evidence that LaSalle has ever resorted to physical violence against Mother, X, or any other child. (The incident depicted in Exhibit R hardly suggests otherwise—it is natural and understandable that a husband might become momentarily angry upon observing his wife's ex-husband snooping around the neighborhood taking pictures.) Finally, it is telling that LaSalle has custody of his child from a previous relationship—an arrangement CFSA officials would presumably not allow if LaSalle were a danger to children.

There has also been some suggestion by Father that the Children would be exposed to illicit drug use if returned to the care of Mother and LaSalle. But Mother testified without contradiction (and with some corroboration) that she has never used drugs and the only evidence concerning LaSalle related to historic marijuana use that was apparently legal under Canadian law.

As for the incident in July 2018 in which E.N.A. broke his arm, this has zero evidentiary value. Young children often suffer accidental injuries.

As for the incident in 2017 when Mother became angry and waved around a baseball bat, although this incident was not particularly flattering, it is understandable that a mother might become upset if she perceived that her mother-in-law was using a locked door to keep her from visiting her children. Additionally, there is no evidence that Mother hit anybody with the bat, let alone displayed a deep-seated propensity for violence that would somehow expose the Children to a grave risk of harm if returned to her care.

As for the evidence that the Children sometimes had to wait in the cold for the bus and/or returned from visits with Mother with empty stomachs, this falls far short of the sort

of "serious abuse" that must be present to satisfy the grave-risk exception.

Finally, as for the evidence suggesting that the Children became emotionally attached to Father following the divorce (and have grown further attached to him since the relocation to Arizona), this also fails to establish a grave risk of harm. *See, e.g., Cuellar*, 596 F.3d at 511 ("The fact that a child has grown accustomed to her new home is never a valid concern under the grave risk exception, as it is the abduction that causes the pangs of subsequent return. Rather than allowing an abducting parent to profit from the psychological dislocation that he has caused, the Convention attempts to avoid the harm by deterring parents from abducting their children in the first place.") (citations and internal quotation marks omitted). *See generally Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir. 1996) ("[A] grave risk of harm for the purposes of the Convention can exist in only two situations. First, there is a grave risk of harm when return of the child puts the child in imminent danger prior to the resolution of the custody dispute—*e.g.,* returning the child to a zone of war, famine, or disease. Second, there is a grave risk of harm in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.").

VI. Costs

Mother asks the Court to require Father "to pay [Mother's] necessary expenses including courts costs, reasonable attorneys' fees, care expenses, and any transportation costs incurred for the children's return." (Doc. 6 at 9.)

This request is governed by 22 U.S.C. § 9007(b)(3), which provides:

> Any court ordering the return of a child pursuant to an action brought under section 9003 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

*Id.* As the First Circuit has explained, although this formulation creates a "duty . . . to order the payment of necessary expenses and legal fees," this duty is "subject to a broad caveat

denoted by the words, 'clearly inappropriate," and thus "giv[es] the district court broad discretion." *Whallon v. Lynn*, 356 F.3d 138, 140 (1st Cir. 2004). *See also Oztalin v. Oztalin*, 708 F.3d 355, 375 (2d Cir. 2013) ("[A] prevailing petitioner in a return action is presumptively entitled to necessary costs, subject to the application of equitable principles by the district court.").

Here, the Court will exercise its discretion to grant Mother's request in part and deny it in part. Although Father did not, in his answer, articulate a compelling reason why a cost award would be "clearly inappropriate,"[9] the evidence presented during the hearing shows that Father has little in the way of financial resources. Furthermore, although Father did not, in the final analysis, have a valid defense to Mother's ICARA claim, the Court strongly disagrees with Mother's counsel's assertion, during closing argument, that Father's decision to move the Children to Arizona was motivated solely by spite and resentment. The Court's observation is that Father genuinely loves the Children and simply made a poor, if in some ways understandable, decision to take the Children with him due to his loss of immigration status. Accordingly, the Court will order Father to pay the transportation costs associated with returning the Children to Canada, as well as Mother's airfare for traveling to and from the evidentiary hearing, but will not require him to pay any other costs. *In re Application of Stead v. Menduno*, 77 F. Supp. 3d 1029, 1038 (D. Colo. 2014) ("The Court finds that an award of filing fees and deposition costs is inappropriate in this matter, given the petitioner's pro bono representation and respondent's relatively low salary, total savings of slightly over $2,000, the fact that respondent spends 80% of her income on housing, and the fact that most of her other expenses relate to providing for A.C.S. The Court does, however, find that an award of petitioner's airfare to and from the hearing is appropriate.").

…

---

[9] The answer's sole statement on this issue is that "Your Honor I ask that since she brought this suit against me that she bears her own costs for attorney fees, court costs and expenses etc." (Doc. 21 at 15.) This argument is not compelling because ICARA creates a presumption that a prevailing petitioner should be entitled to recover costs and fees.

Accordingly, **IT IS ORDERED** that:

(1) Mother's amended petition (Doc. 6) is **granted**;

(2) Mother's motion to dismiss (Doc. 22) is **denied as moot**;

(3) Mother's motion to strike (Doc. 23) is **denied**;

(4) Father shall return the Children to Canada within **21 days** of this Order;

(5) The return to Canada shall be accomplished by Father purchasing an airplane ticket for Mother to fly to Arizona, as well as airplane tickets for Mother and the Children to fly together on the same flight back to Canada, and Father shall consult in good faith with Mother to identify the dates and times of the tickets;

(6) Mother may, within 14 days of entry of this Order, file a motion for expenses limited to her airfare traveling to and from the evidentiary hearing; and

(7) The Clerk of Court shall enter judgment accordingly and terminate this case.

Dated this 19th day of November, 2019.

Dominic W. Lanza
United States District Judge